IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|                    |     |                           |
| ------------------ | --- | ------------------------- |
|                    | )   |                           |
| UNITED STATES      | )   |                           |
|                    | )   |                           |
| v.                 | )   | No. 14 CR 366             |
|                    | )   |                           |
| BRIAN THURMAN      | )   | Judge Virginia M. Kendall |
|                    | )   |                           |

**MEMORANDUM OPINION AND ORDER**

On June 24, 2014, a federal grand jury charged Defendant Brian Thurman with knowingly and intentionally distributing 100 grams or more of a mixture and substance containing a detectable amount of heroin in violation of 21 U.S.C. § 841(a)(1). Thurman moved to suppress the evidence acquired from a warrantless search of his cellphone alleging that the search violated the Fourth Amendment and that he did not consent to the search. He also moved to suppress statements he made to law enforcement in at the time of his arrest claiming violations of his Fifth and Sixth Amendment rights. To support his position to obtain a hearing, Thurman filed a sworn affidavit stating that he was given three forms: Consent to Search (for his iPhone), a Consent to Search (for an apartment building) and an Advice of Rights and Waiver form. Thurman stated in his sworn affidavit that he refused to sign each form, refused to give consent, and refused to give information to law enforcement agents without having an attorney present. As a result of the conflicting evidence, this Court held an evidentiary hearing on Thurman's motions on April 27, 2015. For the following reasons, Thurman's Motion to Suppress Evidence [43] and Motion to Suppress Statements [44] are denied.

**I. Hearing Testimony**

At the suppression hearing, the Court heard testimony from Special Agent Darin Nemerow from the Bureau of Alcohol, Tobacco, Firearms, and Explosives in St. Paul, Minnesota; Special Agents Tony Heiserman and Chris Labno from the ATF in Chicago, Illinois; former ATF-Task Force Officer and current detective with the Chicago Police Department, Patrick Munyon; and Jason Eikam, a police officer in Duluth, Minnesota and an ATF-Task Force Officer. Prior to this investigation, the officers from Chicago had not worked with or otherwise maintained relationships with the officers from Minnesota; none of the officers had heard the name Brian Thurman.

On August 6, 2013, officers in Minnesota stopped a vehicle and recovered approximately 500 grams of heroin.[1] (Tr. 18.) The driver of the vehicle cooperated with authorities and identified the source of heroin, subsequently identified by authorities as Brian Thurman. (Tr. 18-19; 68.) That same month, agents from the ATF in Minnesota contacted ATF agents in Chicago to ask for assistance in the investigation. (Tr. 67.) Specifically, the agents were seeking help in identifying the source of heroin and making a controlled purchase using their cooperating informant. (*See* Tr. 67; 137.)

On August 20, 2013, the Minnesota and Chicago agents collaborated to have the informant make a controlled payment of money owed to Thurman for heroin seized by the ATF earlier that month. (Tr. 19.) The payment was made at Thurman's residence, 1043 North Massoit Avenue in Chicago. (*Id.*) The officers obtained an anticipatory search warrant for Thurman's residence that would be contingent on the purchase of heroin. (Tr. 20; 69.) The informant made a second controlled payment on September 23, 2015, again at Thurman's residence. (Tr. 20; 23.) At the time of the second controlled payment, the informant also made a controlled purchase of

---

[1] References to the transcript of the April 27, 2015 hearing are abbreviated as "Tr. ___."

approximately 158 grams of heroin. (Tr. 20.) Following that payment and purchase, the agents executed the search warrant for Thurman's residence.

After the September 23rd purchase, at approximately 10:30 p.m., Agent Labno and an armed entry team executed the search warrant at Thurman's house. (Tr. 55; 65; 70; 84.) They knocked on the front door, announced, waited an amount of time, and then forced entry to Thurman's residence. (Tr. 20-21; 69-70.) Agent Labno and the agents encountered Thurman in the basement of the residence. (Tr. 70.) Agents ordered Thurman to the ground, placed him in handcuffs, and removed him from the residence. (Tr. 71.)

Agent Labno brought Thurman over to Agent Heiserman's car and asked Agent Heiserman to stay there with him while he spoke to Thurman. (Tr. 48; 71.) Agent Labno testified that he told Thurman that he was under arrest and did not need to make any statements and also that the agents were going to conduct a search of his house. (Tr. 48; 71.) SA Heiserman corroborated SA Labno and testified that Labno Advised Thurman that he need not make any statements. Agent Labno did not provide Thurman a full *Miranda* warning at that point—he merely advised Thurman that he was under arrest and did not have to say anything. (Tr. 71-72.) Agent Labno testified that Thurman expressed concern about his girlfriend and son and said there were two firearms in the residence. (Tr. 48-49; 72.) Agent Labno left Thurman handcuffed in the backseat of Agent Heiserman's vehicle with Agent Heiserman. (Tr. 49; 73.)

Agent Labno testified that he returned about 15 minutes later and said he would like to search the other building Thurman owned at 1037 Massasoit. (Tr. 49-50; 74.) Agent Labno presented Thurman with an ATF Consent to Search form. (Tr. 50; 74-75.) Agent Labno presented the form to Thurman and explained his rights which are also set forth on the form. (Tr. 50; 75.) Labno stated that Thurman said he did not want to sign anything, but that he would

permit the law enforcement agents to go into the common areas, garage, and the BMW at the second property. (Tr. 50-51; 75.) Thurman specified, however, that he did not want the agents to go into the apartments themselves. (Tr. 51; 76.) Agent Labno wrote "garage, BMW sedan" and "common areas only" on the form to indicate Thurman only consented to the search of the common areas of the building. (Tr. 51-52; 74-75.) Agent Labno then wrote "refused to sign but consented" on the signature line and then Agents Labno and Heiserman signed the form. (Tr. 52; 75.) Agent Heiserman recalled Thurman saying: "I'm giving you verbal consent to go into that residence." (Tr. 65; 76.) Agent Labno similarly recalled him saying: "I know my rights. I can give you verbal consent and I'm doing that." (Tr. 76.)  SA Labno wrote on the signature line "Refused to sign but consented."

Thurman never asked for an attorney while seated in Agent Heiserman's car. (Tr. 53.) Agent Labno never attempted to force Thurman to sign the form and the interactions between Agent Labno and Thurman was consensual. (*Id*.) At the end of the search, Agent Labno returned to the vehicle and told Thurman that his girlfriend and son were fine and that they wanted to take Thurman to the ATF to discuss their findings and cooperation. (Tr. 77.) Agent Heiserman and another special agent from Minnesota transported Thurman back to the ATF Chicago Field Division, where his interview began around 1:00 a.m. on September 24, 2013. (Tr. 53; 21; 23.)

The interview took place in an interview room at the offices of  the ATF. (Tr. 78; 140.) Thurman's handcuffs were removed inside the interview room. (Tr. 78; 126.) At Thurman's request, he was given a Gatorade. (Tr. 79.) Agent Labno, Agent Nemerow, Officer Munyon, and Agent Eikam were present at the start of the interview, though Agent Labno took the lead. (Tr. 78; 127; 22; 79.) The interview began by Agent Labno taking out the Advice of Rights and Waiver form, reading each statement to Mr. Thurman, and explaining the statements in plain

English. (Tr. 23; 79-80; 142.) Agent Labno asked Thurman if he could read and write, and whether he could understand him as as read aloud. (Tr. 35; 80; 129; 142.) Thurman said he was well educated and had graduated from Purdue University. (Tr. 80; 129; 142.) Agent Labno read Thurman the *Miranda* warning at the top of the form and Thurman followed along as he read aloud. (Tr. 24; 142.) Agent Labno also read and discussed the "Waiver" portion of the page with Thurman. (Tr. 24; 80; 129.)

According to the four witnesses present at the start of Thurman's interview, Thurman was willing to waive his rights to speak with law enforcement, but was not comfortable signing the Waiver. (Tr. 24-25; 80; 129; 143.) Agent Labno, therefore, wrote "refused" on the Waiver. (Tr. 24-25; 81; 145-146.) Agent Labno, Agent Eikam, Officer Munyon, and Agent Nemerow all signed the document to memorialize that Thurman was interested in waiving his rights and speaking with law enforcement, but did not want to sign the form. (Tr. 23; 25; 81.) After this process was completed, the interview was conducted. (Tr. 25; 82.) During the interview, Thurman provided incriminating information about his involvement in heroin trafficking. (Tr. 25.) He was cooperative during the interview. (Tr. 25-26; 28; 88; 130.) He never said he did not want to talk and he never asked for an attorney. (Tr. 26; 42; 87; 130; 142.)

At some point during the interview, the agents asked Thurman if they could search his cellphone. (Tr. 82.) Agent Labno provided Thurman with another Consent to Search form. (Tr. 83; 131.) Agent Labno explained that he had given Thurman the same form earlier in the evening when the agents wanted to search his second property. (Tr. 85; 131.) Agent Labno then went through the form with Thurman. (*Id*.) Thurman said he was fine with the agents searching his cellphone, but did not want to sign anything. (Tr. 85; 132.) Agent Labno wrote "refused to sign but consented" on the form and he and Officer Munyon signed the same. (Tr. 84; 131.) Agent

Labno and Officer Munyon then went through the cellphone with Thurman and Thurman explained things in the cellphone based on their questioning. (Tr. 85.)

During the interview, Thurman expressed an interest in cooperating with law enforcement, though he also expressed concerns about the safety of his family. (Tr. 26-27; 86; 148.) Notwithstanding that fear, Thurman and the agents derived a plan for Thurman to cooperate proactively with law enforcement by calling one of the contacts in his phone the following day. (Tr. 27; 85; 87; 148.) Thurman asked whether he should have an attorney with him at the next meeting or further cooperation. (Tr. 27; 87.) Agent Labno responded that he could not advise Thurman about that and that it was his choice whether to retain a lawyer. (Tr. 27-28.) In the end, Thurman agreed to cooperate with the agents and expressed his desire to get a good deal. (Tr. 114) Thurman was released that morning to allow him to further his cooperation. (Tr. 28; 88; 148-149. The next day, Thurman was expected to return to begin his cooperation by making some phone calls. Instead, the agents received a call from his attorney who had advised Thurman that it would not be beneficial to cooperate with the agents. At the hearing, three agents testified for the Government: Agent Darin Nemerow, Agent Tony Heiserman, and Agent Chris Labno. All of the agents were consistent in their testimony that Thurman consented to the searches and the interview and only refused to sign the written forms.

At the hearing, the Defense attorney called Detective Patrick Munyon from the Chicago Police Department who was present for the search and the interview. Detective Munyon testified that he was present when Agent Labno advised Thurman of his rights and that Thurman never asked for a lawyer after being advised of his rights. Detective Munyon was also present when Thurman was presented with the consent to search form and he testified that Thurman consented and was cooperative but did not want to sign the form. Next the defense called Officer Jason

Eikam of the City of Duluth, Minnesota Police Department. Eikam testified that Agent Labno read Thurman his rights prior to the interview but he refused to sign the form. Detective Eikam also testified that Thurman told the agents that he was educated, could read and write and that he was studying for his master's degree. Eikam further testified that Thurman never asked for a lawyer and that he refused to sign the form. Both defense witnesses testified that Thurman expressed an interest in cooperating and also expressed concerns about his family. In short, the defense witnesses were consistent with the prosecution witnesses.

## II. DISCUSSION

Thurman supports his position that he did not consent to the searches or the interview by setting forth the two consent forms which are marked "refused" and his sworn statement that he did not consent or agree to be interviewed without his attorney. Thurman did not take the witness stand and tell his version of what occurred and the Court was not able to judge his credibility in comparison the credibility of the agents. Thurman's counsel argues that the statements her client made to law enforcement officers during his interview at the Chicago ATF should be suppressed because he did not knowingly and voluntarily waive his privilege against self-incrimination and the right to counsel. She further argues that the evidence recovered from the warrantless search of his cellphone during that interview should be suppressed because he did not consent to the search.

### A. Statements

A suspect subject to custodial interrogation has the right to remain silent and the right to consult with an attorney and have counsel present during questioning. *Miranda v. Arizona*, 384 U.S. 436, 468-73 (1966); *United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011). The police must explain these rights to the suspect before the questioning begins. *Davis v. United*

*States*, 512 U.S. 452, 457 (1994); *Miranda*, 384 U.S. at 471. For an accused's statement made during a custodial interrogation without the presence of counsel to be admissible at trial, the Government must "establish [by a preponderance of the evidence] that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement.' " *See Berghuis v. Thompkins*, 560 U.S. 370, 382-84 (7th Cir. 2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The waiver must be both "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 382-83 (internal quotation marks and citation omitted). The waiver need not, however, be express. *Id.* at 384. An implicit waiver is sufficient to admit a suspect's statement into evidence. *See id*.

As a preliminary matter, the Court finds that Thurman did not unambiguously invoke the *Miranda* right to remain silent or the *Miranda* right to counsel as required for the authorities to end their interrogation. *See id.* at 381 (holding that invocation of either *Miranda* right to counsel or *Miranda* right to remain silent must be "unambiguous"). The only evidence of either invocation is that Thurman avers in his affidavit that he "refused to provide any information to law enforcement agents without the presence of an attorney." (*See* Dkt. 45-2; 46-2.) This statement, however, does not clarify whether Thurman requested an attorney and was refused one; whether Thurman stated he did not want to talk to agents, but was questioned regardless; or whether Thurman merely sat and remained silent during questioning. Moreover, and more importantly, this statement is overwhelmingly refuted by the testimony of five credible witnesses at the suppression hearing—all of whom testified that Thurman never asked for an attorney or refused to answer questions. (*See* Tr. 26; 42; 81; 87; 129-30; 142.) The only mention of an

attorney during Thurman's interview was at the very end when Thurman "asked if he should have an attorney with him during [the] next meeting or further cooperation." (Tr. 27.)

That Thurman refused to sign the Advice of Rights and Waiver ("Waiver") presented to him at the start of his interview at the Chicago ATF is similarly not indicative of Thurman invoking his *Miranda* rights. *See United States v. Smith*, 218 F.3d 777, 781 (7th Cir. 2000) ("[W]aiver may be inferred from the defendant's conduct, even when [he] has refused to sign a waiver form.") On the contrary, his conduct subsequent to that refusal amounts to an implied waiver. Thurman was able to and did understand the Waiver. In his affidavit, Thurman avers that he was provided with the Waiver. He does not claim to have had any difficulty understanding the Waiver and testimony from the suppression hearing demonstrates that Thurman understood both his rights and the implications of waiving those rights. At the suppression hearing, the Court heard testimony from the four agents present at the start of Thurman's interview: Agent Labno, Agent Nemerow, Officer Munyon, and Agent Eikam. The Court found all four witnesses credible based on their demeanor and the consistency of their testimony: all four provided similar, independent accounts of the subject interview and Thurman's statements during the interview. The agents demonstrated no apparent bias in their testimony and none was suggested by Thurman. The two agents from Minnesota had never met the two agents from Chicago prior to this investigation—save for a cursory meeting between two of the agents at a training program—and none of the agents had heard of Thurman before this case.

All four agents testified that Agent Labno read Thurman his rights and then explained them in plain English. Thurman told the officers he was highly educated and was able to read and write. Thurman refused to sign the Waiver, but agreed to speak with the agents and did so cooperatively. Thurman began speaking with the agents immediately after refusing to sign the

waiver and continued to speak with them throughout the interview. During that time, Thurman never refused to answer a question and never requested an attorney. On the contrary, Thurman appeared to be providing information in the hopes of cooperating with the agents to receive some sort of benefit. In fact, before the interview ended, Thurman and the agents derived a plan for Thurman to continue cooperating with law enforcement upon his release from the ATF. The Court finds this evidence of cooperation persuasive in determining the voluntariness of Thurman's statements, regardless of whether the cooperation was fruitful following this interview. *See, e.g., United States v. Brown*, 664 F.3d 1115, 1118 (7th Cir. 2011) (finding implied waiver where accused appeared to have "provided information in the hope that he could make a deal with the police").

The Court disagrees with Thurman that the circumstances preceding and surrounding the interview rendered his statements involuntary. (*See* Dkt. No. 59, Def. Position Paper at 2). Statements are involuntary only where obtained through coercion or overreaching as to "overbore the accused's free will." *See United States v. Murdock*, 491 F.3d 694, 699 (7th Cir. 2007). Thurman was justifiably concerned when armed agents searched his home with his girlfriend and son inside. He was understandably scared when he was removed from his home in handcuffs and placed in a law enforcement vehicle without immediately knowing where his girlfriend and son were. He was in handcuffs during most—if not all—of the time the search was being executed. None of this, however, amounts to psychological or physical pressure sufficient to render Thurman's subsequent waiver of rights involuntary. *See, e.g., United States v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006) (*abrogated on diff. grounds*, 552 U.S. 85 (2007)) (where police had probable cause to arrest suspect's girlfriend, suspect's confession was not coerced where police threatened to arrest his girlfriend if he did not confess); *United States v. Huerta*,

239 F.3d 865, 872 (7th Cir. 2001) (eleven hours of detention did not render a confession involuntary where the defendant was not continuously interrogated and where no credible evidence existed that she was too tired, medicated, or hungry to understand the proceedings); *United States v. Doe*, 149 F.3d 634, 639 (7th Cir. 1998) (questioning a handcuffed defendant in the back of a police car in a remote location for more than an hour insufficient to render a waiver involuntary).

The Court finds that the authorities acted professionally during all of their interactions with Thurman and the initial search of Thurman's two properties. Moreover, while Thurman sat handcuffed in a law enforcement vehicle during the search of his house, he was sufficiently comfortable engaging with authorities to provide only limited consent to search his second property. The results of that search are not at issue, but this Court finds the interaction significant because it demonstrates both that Thurman understood his rights and was able to participate in voluntary decision-making in the heat of, what appears to the Court based on the record to be the most turbulent part of the evening. There is no evidence of intimidating or coercive conduct taking place between the time Thurman provided that limited consent and the time of his interview. Thurman was assured that his family was safe and was provided a Gatorade upon his request at the Chicago ATF. His handcuffs were removed once he was secured in the interview room.

On the facts before the Court, there is no credible argument that Thurman's conduct was not a waiver of his *Miranda* rights and his motion to suppress statements made in the face of that waiver is denied. *See Thompkins*, 560 U.S. at 385-86; *see also, United States v. Johnson*, 495 F.3d 536, 542 (7th Cir. 2007) (affirming finding of voluntariness where, despite being concerned about other residents in home, interview was calm and professional and defendant did not feel

threatened or coerced); *United States v. Santiago*, 428 F.3d 699, 705 (7th Cir. 2005) (affirming finding of voluntariness where district court relied, in part, on finding that authorities behaved professionally and encounter was "devoid of any badgering or harassment"); *Smith*, 218 F.3d at 781 (finding valid waiver where defendant's "rights were read to her in a slow, deliberate and understandable manner and [defendant] was given the printed form to read, which she appeared to do. When asked whether she understood her rights, [defendant] indicated that she did. She then refused to sign a waiver form, but went on to confess anyway.")

### B. Cellphone

At some point during Thurman's interview at the Chicago ATF, Agent Labno asked for Thurman's consent to search his cellphone. (Tr. 82-83). Generally, officers must secure a warrant before conducting a search of a cellphone incident to a lawful arrest. *Riley v. California*, 134 S. Ct. 2473, 2485 (2014). The Fourth Amendment prohibition against warrantless searches does not apply, however, "where the defendant consents voluntarily to the search." *Johnson*, 495 F.3d at 541. The voluntariness of a defendant's consent to search is a factual determination and the Government bears the burden of proving the defendant's consent was feely and voluntarily given. *See id*. In determining whether a defendant voluntarily consented to a warrantless search, the Court considers a number of factors, including: "(1) the person's age, intelligence, and education, (2) whether he was advised of his constitutional rights, (3) how long he was detained before he gave his consent, (4) whether his consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when he gave his consent." *Id*. at 542 (internal quotation marks and citation omitted).

Thurman, by all accounts, even his own, is an articulate and intelligent man. He was advised of his rights regarding the search of his cellphone and understood those rights. Agent Labno explained to Thurman that the Consent to Search form for the cellphone was the same form he had presented to Thurman earlier in the night when Thurman had provided limited consent to search his second property. In limiting his consent earlier in the night, Thurman demonstrated a clear understanding of both his rights and the Consent to Search form, as well as his comfort dealing with Agent Labno. Despite Thurman's experience with the Consent to Search form, Agent Labno read the form to Thurman and explained it to him in plain English for a second time. Thurman then, once again, refused to sign the form, but agreed to the search. There is nothing in the record explaining why Thurman felt he could not limit or object to this search of his cellphone as he had done earlier in the night with his second property.

Thurman's claim that he did not voluntarily consent to the search of his cellphone is defied by the record before the Court. As he did in support of his motion to suppress statements, Thurman cites to the circumstances preceding and surrounding his arrest to demonstrate intimidation and coercion. (*See* Dkt. No. 59, Def. Position Paper at 19). But, as explained above, those circumstances are insufficient to render Thurman's consent to search involuntary. There is no evidence of physical coercion or intimidation in the record and, on the contrary, Thurman appeared to be cooperating with authorities during the search of his cellphone to gain a benefit. While going through his cellphone with Agent Labno and Officer Munyon, Thurman worked with the officers to identify a source that Thurman agreed to speak with the following day as part of his cooperation. (*See also*, Tr. 28; 42-43; 87-88; 148-49) (suggesting that Thurman was released to continue cooperating with authorities). In light of the facts now before it, this Court finds that Thurman voluntarily consented to the search of his cellphone and his motion to

suppress the results of that search is denied. *See, e.g., United States v. McGlothin*, 391 F. App'x 542, 545 (7th Cir. 2010) (affirming district court's finding that accused provided voluntary consent to search cell phone despite not having been advised of his right to refuse consent and having "below-average intelligence").

## <u>CONCLUSION</u>

For the reasons stated above, Thurman's Motion to Suppress Evidence [43] and Motion to Suppress Statements [44] are denied.

Date:   9/3/2015

Virginia M. Kendall
United States District Judge